# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 6, 2001

## STATE OF TENNESSEE v. ALFONZO CHALMERS

**Appeal from the Criminal Court for Shelby County**
**No. 98-09236     Chris Craft, Judge**

---

### No. W2000-00440-CCA-R3-CD  - Filed April 4, 2001

---

The defendant appeals from his conviction for first degree premeditated murder. He contends that the evidence is insufficient to support the conviction and that the trial court erred by impermissibly commenting on the evidence in violation of article VI, section 9 of the Constitution of Tennessee. We affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

A C Wharton, Jr., Shelby County Public Defender; Garland Ergüden, Assistant Public Defender (on appeal); and Mozella Ross, Assistant Public Defender (at trial), for the appellant, Alfonzo Chalmers.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Scott Gordon, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Alfonzo Chalmers, appeals as of right from his conviction by a Shelby County jury for the first degree premeditated murder of Antonio Gray. The defendant received a sentence of life in prison. The defendant contends that (1) the evidence was insufficient to support his conviction and (2) the trial court impermissibly commented on the evidence, in violation of article VI, section 9 of the Constitution of Tennessee, when it instructed the jury concerning leading and non-leading questions.

At trial, Michael Young, a maintenance worker at the Watkins Manor Apartments in Memphis, testified as follows: On February 25, 1998, around 3:00 p.m., he was on his way to prepare a vacant apartment for new tenants on the second floor of Building 2625 when he heard gunshots. He ducked quickly into the vacant apartment and called his supervisor on a two-way radio

and told him that he heard gunshots and to call 911. He then stepped outside the apartment to see what was happening, and he saw the victim lying on the pavement outside Building 2611, which was across a drive from Building 2625. A man was standing over the victim and pointing a gun at the victim's head. Then the man fired one shot into the victim's head. As Mr. Young was coming down the steps, he saw the man with the gun pass him driving a "Chevrolet, blue or gray, about 78, 79, Oldsmobile or something like that, boxcar Chevrolet." He did not see the man with the gun getting into the car, and he did not see what the man did with the gun.

Mr. Young testified that he went directly to the victim to see if he could help him. He said that he did not move the victim's body but that he put water on the victim's face. The victim did not respond in any way. He stated that he did not see a gun on the victim's body and that he never saw anyone take a gun off his body. He said that he never lost sight of the body from the time of the gunshot into the victim's head until he reached the body. He testified that he was able to identify the defendant as the shooter from a photo spread shown to him by police detectives on the day after the shooting. He said that he had seen the defendant on a number of occasions in the apartment complex, including in apartment 8 in Building 2611, when he had gone into that apartment on maintenance calls. He stated that he believed that apartment 8 belonged to a woman named Sophia.

Alan King testified as follows: On the afternoon of the shooting, he went to Watkins Manor Apartments to visit his girlfriend. He arrived with his brother, Alexander King, and the victim, Antonio Gray, met them. As he, his brother, and the victim were walking around Building 2611, the defendant came out of the building. William Yarbrough, the husband of his cousin, was also outside Building 2611. The defendant was carrying a nine-millimeter handgun, car keys, and a cellular telephone charger. The defendant placed the gun on the hood of a "gray Delta 88," opened the car with his keys, threw the telephone charger into the car, and shut the car door. The defendant then took the gun off the hood of the car and walked toward the group. The defendant put his arm around Alexander King and walked with him to the apartment from which the defendant had left. The defendant asked him how he was doing, and then looked at the victim and asked, "What's up, my Ni***r?" The victim did not respond, and then the defendant shot the victim, which caused the victim to cross his arms and lean forward. The defendant kept shooting, and after the second or third shot, the victim ran. The defendant, still shooting, pursued the victim, and the victim fell to the pavement after the fourth or fifth shot. The defendant then leaned over the victim and shot him in the head. Mr. King said that neither he nor the victim had a weapon.

On cross-examination, Mr. King testified that he knew the defendant and knew where he lived with Sophia Reed. He said that he had previously seen the defendant driving a "pearl cream box Chevy with a dark brown top with some gold rims," and the car had a number of bullet holes in it. He stated that this was not the same car as the one in which the defendant left immediately after the shooting. According to the defendant's fiancé, who testified later for the defense, the car shooting had occurred approximately a week before the shooting of the victim at Watkins Manor.

Detective Miguel Aguila with the Memphis Police Department testified as follows: He was one of the officers responding to the report of a shooting at Watkins Manor on February 25, 1998,

and learned that the defendant was a possible suspect. When someone at the scene made contact with the defendant by telephone, he spoke with a male who identified himself as Alfonzo and said that he had shot the victim because the victim was going to kill him. He arranged to meet the defendant at the home of the defendant's aunt, and when he arrived, the defendant appeared scared and upset. The defendant "just kept saying over and over that he had to shoot Toni, that Toni had shot at him a week prior to this incident and shot up his vehicle, and that he was scared that Toni was going to kill him so he had to shoot Toni." The defendant did not have a gun with him, and a gray Oldsmobile at the house was identified as the defendant's.

Detective Aguila testified that when he put the defendant in his squad car, he asked for personal information only. He said that the defendant "seemed fine," except that he was "a little nervous and scared," and that everything the defendant said made sense.

Officer Aaron Merritt with the Memphis Police Department Crime Scene Unit testified that he retrieved four, spent nine-millimeter casings from the crime scene at Watkins Manor. Additionally, Steve Scott, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified that by microscopically examining the four casings taken from the crime scene, he was able to determine that all four casings were fired from the same gun. Agent Scott said that he was one hundred percent certain of these results.

Dr. Wendy Gunther, a forensic pathologist with the Regional Forensic Center in Shelby County, testified that she performed the autopsy of the victim. Dr. Gunther testified regarding the four gunshot wounds to the victim as follows: The bullet that caused the victim's death entered the victim's head in front of his ear, fracturing bones, including his first cervical vertebra, and hitting all the blood vessels that supply blood to the brain. The bullet was lodged in the victim's neck. A second bullet entered the victim's right buttock, and it was found in his right thigh. This wound, around which approximately two pints of blood had gathered, contributed to his death, but did not cause his death by itself. This wound was consistent with being shot from behind. A third bullet entered the victim's front left leg close to where the leg joins the body, or the inguinal crease. This was a flesh wound only and, though painful, insignificant. Finally, a fourth gunshot wound was the exit point for the bullet that entered the victim's left leg. It was a superficial wound on the left side of the victim's upper left thigh.

Dr. Gunther testified further that there was no alcohol in the victim's blood and no drugs other than the one administered by the medical team for resuscitation purposes. On cross-examination, Dr. Gunther stated that no gunpowder residue was found on the victim's hands but that this might have been the result of washings that would likely have occurred in the emergency room.

Adisha Moore, testified as follows: On the day of the shooting, she and her son were at the apartment where the defendant and Sophia Reed lived. She knew the couple because she was dating Sophia Reed's nephew. When the defendant, Ms. Reed, and their baby arrived home, Ms. Reed went into the apartment while the defendant stayed outside. When Ms. Moore walked outside with her son, she saw Alexander King and another man walking around the corner. Alexander King wanted

to see Ms. Moore's son, so Mr. King went inside the apartment. She heard the defendant and the victim having a discussion that was not an argument but "questioning." As she was walking back into the apartment, she heard five gunshots. She ran into the apartment, and when she looked outside, she saw the victim lying on the ground with blood everywhere. She saw the defendant get into his car, back out, and drive away. Then Alan King ran into the apartment, got a towel or sheet, and went outside and removed a gun from the victim's "waist part or either his pocket."

Ms. Moore testified that she did not give a statement to the police at the time of the shooting because she was nervous and scared. Ms. Moore said that she had seen a number of bullet holes in the defendant's car approximately a week prior to the shooting. She also stated that the defendant was not much different from other people she knew, although she noted that when he was upset, he did not want to talk. On cross-examination, Ms. Moore admitted that she did not come forward with information concerning the gun she saw Alan King take from the victim's body until the time of trial because she was "learning as I'm going."

Sophia Reed, the defendant's fiancé, testified that the defendant was the father of three of her five children and that they had lived as a family for ten years. She said that at the time of the incident in this case, she and the defendant had a newborn child. She stated that she was not aware of the defendant's drinking excessively or using cocaine but that the defendant had been treated at the Memphis Mental Health Institute as a residential patient for three months and, at other times, as an outpatient. She said that the defendant was prescribed a drug, Haldol, and that at the time of the shooting, the defendant had not taken his medicine for one or two years.

Ms. Reed testified that a week before the shooting at Watkins Manor, the defendant's car, in which her baby was riding, had been shot. She stated that she saw the car soon after this shooting and that there were bullet holes all over the car, including one which went out the passenger-side window. She stated that the police were not called about this incident because "we didn't know who to call the police on." As to the day of the shooting of the victim, she testified that she did not see the actual shooting but heard the gunshots and saw Alan King remove a gun from the victim's body. On cross-examination, Ms. Reed admitted that her statement to the police on the day of the shooting made no reference to Alan King taking a gun from the victim's body.

Dr. Rokeye S. Farooque, attending psychiatrist at Middle Tennessee Mental Health Institute Forensic Service Program, testified as follows: By court order, the defendant had been sent to be evaluated as an inpatient for twenty-four days at the Institute. She reviewed and evaluated records from two other institutions where the defendant had received treatment: Western Mental Health Institute and Memphis Mental Health Institute. The defendant's past treatment included the anti-psychotic drug, Haldol, and she continued anti-psychotic medication while the defendant was a resident at Middle Tennessee Mental Health Institute because the defendant complained of hearing voices. She had some questions about the validity of the defendant's complaints because the defendant said he was having problems sleeping but was sleeping fine. Also, the defendant was interacting with others within the unit without any problems. The diagnosis for the defendant was cocaine and alcohol abuse, and at that time, they did not see any symptoms of mental illness. The

Staff Conference Report stated that additional testing of the defendant was representative of someone attempting to appear severely disturbed.

On redirect examination, Dr. Farooque testified that the defendant was receiving medication to allow him to sleep soundly at night. She also testified that no institution evaluating the defendant, including her own, had ever mentioned a diagnosis of malingering.

Dr. Sam Craddock, a clinical psychologist with the Middle Tennessee Mental Health Institute, testified that he was a member of the team evaluating the defendant. He said that, based upon assessments of the defendant's intellectual functioning, the defendant functioned at approximately the fourth or fifth grade level. On cross-examination, Dr. Craddock stated that the defendant's behavior in the residential unit was better than they had expected. He said that the defendant had no trouble making telephone calls, interacting with his peers, and participating in the activities in the dayroom or in the gym but that when the defendant was with the doctors, he would profess either to remember things or to complain that he was hearing voices that were interfering with his daily activities. Dr. Craddock stated that it was the conclusion of the team observing the defendant that the defendant was attempting to give a deceptive impression of himself.

Helen Jean Williams, the defendant's aunt, testified to a history of mental illness in the family. Ms. Williams testified that the defendant's mother had been institutionalized with a nervous breakdown and that the defendant's grandmother had also been institutionalized, although Ms. Williams did not know for how long or for what reason. On cross-examination, Ms. Williams testified that at the time of the defendant's arrest at her home, she did not think that he was under the influence of alcohol.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction. He argues that the State failed to establish that he acted with the requisite culpable mental state because it failed to prove beyond a reasonable doubt that he was sufficiently free from excitement and passion so as to be capable of premeditation. The State contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

First degree murder is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). Tennessee Code Annotated section 39-13-202(d) provides as follows:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The evidence establishes that on February 25, 1998, the defendant, while outside his apartment at Watkins Manor, in the presence of the victim and witnesses, placed a gun on the hood of his car, unlocked the car door, placed a cellular telephone charger into the car, closed the door, took the gun off the hood, and approached the group of young men standing outside his apartment. The defendant then looked at the victim and asked, "What's up, my Ni***r?" The victim did not respond, and then the defendant fired at the victim, hitting him in the front of his left leg at the point where the leg joins the body. The bullet went through the victim's body. The victim then turned and ran, and the defendant continued to shoot at the victim, hitting him next in the right buttock. The defendant pursued the victim, who by this time had fallen to the pavement. The defendant then stood over the victim and fired into the victim's head, causing massive internal damage and the death of the victim. The defendant then got into his car and drove away.

The defendant contends that no explanation was offered for the testimony of Adisha Moore or Sophia Reed that they saw Alan King remove a gun from the victim. Mr. King testified that the victim did not have a gun. Questions concerning the credibility of witnesses and the weight and value to be given to the evidence are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). In addition, both Ms. Moore and Ms. Reed testified in court that the gun was not in the victim's hand but in a pocket or in his waistband, testimony that undercut the defense's theory of self-defense or circumstances that involved "excitement and passion" on the part of the defendant. There is no proof that the victim fired at the defendant. In fact, all casings found at the scene were from a single weapon.

The defendant also contends that his medical history, including his treatment at two mental institutions for delusions, supported a finding that he was not capable of the premeditation necessary for first degree murder. Expert testimony revealed that the defendant, although functioning at a marginal intellectual level, had no signs of mental illness. It was up to the jury to resolve all issues concerning the weight and value to be given to this evidence. We conclude that the evidence is sufficient to support the defendant's conviction for premeditated first degree murder.

## II. IMPERMISSIBLE COMMENT ON THE EVIDENCE

The defendant contends that the trial court erred by instructing the jury, before the beginning of any proof in the case, concerning the distinctions between leading and non-leading questions. The following constitutes the statement, in its entirety, to which the defendant now objects:

There are two different types of questions that are asked. There are leading questions and non-leading questions. And I'm going to keep track of all of this, but I want you to know and understand what's going on. A leading question gives the answer in the question. That's not as good as a non-leading question for purposes of proof.

If someone asks a witness what's the weather like on that day that this happened, and the witness says it was raining or the sun was shining. That's an answer. If the attorney had asked the witness wasn't it true that it was raining that day; don't you remember it was raining that day, then the witness may say, yes. You don't know if it was from the witness's memory or from the attorney's question, you see.

So for that reason, leading questions are only allowed on cross-examination. When you're cross-examining a witness and you want to lead them to a certain point, that's okay. On direct examination when a side is putting on a witness, they can't ask leading questions. So they'll [sic] be objections. Sometimes I'll sustain objections to leading. I'll overrule objections. I'm going to keep up with all of that, but I just want you-all to know don't concern yourselves with all my rulings. Don't think somebody's winning here, or according to the judge, this side is winning cause I don't play those games. I just follow along.

The defendant contends that the characterization of leading questions as "not as good as a non-leading question for purposes of proof" impermissibly commented on the evidence and disparaged the value of the proof that was most likely to be elicited by the defense. Essentially, the defendant argues that since leading questions are permitted, with narrow exceptions, during cross-examination only, the trial court's statements could be interpreted by the jury to mean that the proof elicited by the defense through proper cross-examination of the state's witnesses is somehow tainted, thus prejudicing the defendant. The state argues that the trial judge was not commenting upon the evidence but simply trying to explain the trial process and give pretrial instructions. The state agrees that it was not necessary for the trial court to have made the comments but submits that if any error is found by this court, it can only be deemed harmless. The state points to the fact that both the defendant and the state cross-examined witnesses, that there is no proof that the outcome of the trial would have been different had the comments not been made, and that the evidence was more than sufficient to sustain a verdict of guilty.

It is well established that judges in Tennessee are prohibited by our state constitution from commenting on the evidence in the case. Our constitution states the following: "Judge's charge. – The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." Tenn. Const. art. VI, § 9. This constitutional provision was intended to innoculate

our courts from the English practice of "summing up" by which the trial court told the jury, not what was the testimony, but what was proved. See Ivey v. Hodges, 23 Tenn. 154, 155 (1843). Our supreme court has described the fundamental rationale for our constitutional provision in the following: "The Judge may decide what is evidence, but it is for the jury to say what is proof." Ellis v. Spurgin, 48 Tenn. 74, 77 (1870) (emphasis added); see also McDonald v. State, 89 Tenn. 161, 164, 14 S.W. 487, 488 (1890) (cautioning that "[i]t is natural that jurors should be anxious to know the mind of the court, and follow it"). The important aims, then, of our constitutional provision are to guarantee the reliability of an impartial judge and to preserve resolution of the facts for the jury. See, e.g., State v. Eaves, 959 S.W.2d 601, 605 (Tenn. Crim. App. 1997) (finding reversible error when the trial court warned a defense witness concerning the potential for an aggravated perjury charge in the presence of the jury). More recently, our supreme court has stated that while it is well-established that a trial judge possesses broad discretion in controlling both the course and conduct of the trial, a trial judge "must be careful not to express any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial." State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994) (citing State v. Caughron, 855 S.W.2d 526, 536 (Tenn. 1993)). A trial judge is obligated to "be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989).

This issue has typically arisen when the trial court has instructed the jury on an alibi defense in terms that unfairly prejudiced the defendant. See, e.g., Christian v. State, 555 S.W.2d 863, 866 (Tenn. 1977) (concluding that instruction to the jury that disparaged alibi evidence, such as the warning that an alibi defense can be easily fabricated, does indeed "amount to judicial comment upon the evidence offered by the accused" and is erroneous). Such a holding is consistent with our sister states where judicial comment on the evidence is prohibited. See, e.g., People v. McCoy, 220 N.W.2d 456, 456 (Mich. 1974) (finding unlawful an instruction on alibi evidence that it is "easily proven"); State v. Rosenbaum, 449 P.2d 999, 1000 (Utah 1969) ("In this state the trial judge is not permitted to comment on evidence and he, therefore, may not indicate to a jury that evidence is either weak or convincing.").

The issue has also arisen when the trial court became engaged in questioning a witness. In Collins v. State, 416 S.W.2d 766, 767 (Tenn. 1967), our supreme court found reversible error when the trial court engaged in "quite rigid cross-examination of the defendant." The examination by the trial judge "went far beyond an attempt on his part to clear up obscure points in the testimony of the defendant." Id. The fairness of the fact-finding process has also been deemed to be undermined when the trial court essentially told the jury that the defendant was guilty of driving on a revoked license before the count was submitted to the jury. See State v. Gerald C. Mullins, No. 01C01-9507-CC-00230, Coffee County, slip op. at 3-4 (Tenn. Crim. App. Oct. 10, 1996).

Unlike the above cited cases, though, in this case the defendant objects to general instructions aimed at educating the members of the jury, rather than to a comment on any specific evidence in the defendant's case. Nevertheless, we agree that the trial court impermissibly commented on the evidence by stating that when a witness answers "yes" to a leading question, "[y]ou don't know if

it was from the witness's memory or from the attorney's question, you see," making the resulting evidence "not as good" for "purposes of proof." The defendant's case largely relied upon evidence elicited during cross-examination, in which the defendant properly asked leading questions. The court's comments made this evidence appear not as good as other evidence. Thus, in this context, the trial court's comments constitute an impermissible comment on the evidence.

Finding error, we must determine whether it is harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). In State v. Harris, 839 S.W.2d 54 (Tenn. 1992), our supreme court found no reversible error when the trial court, during opening remarks to the jury panel, informed prospective jurors that the defendant might or might not testify. The trial court stated that if the State failed to prove its case, the defendant did not have to do anything. The defendant in Harris argued that these remarks compelled him to testify rather than leave the jury with the impression that the State had proved the case, otherwise the defendant would have "done nothing." Our supreme court noted that the trial court also made it absolutely clear that the defendant was presumed innocent and, further, that the trial court correctly instructed the jury regarding the presumption of innocence and "admonished the jury that the Defendant's failure to testify could not be considered as an admission of guilt." Id. at 67.

In the present case, the trial court made no distinction between the parties as to using leading questions, only stating that "[w]hen you're cross-examining a witness and you want to lead them to a certain point that's okay." At no point did the trial court specifically disparage evidence elicited by the defense through proper leading questioning of witnesses on cross-examination. Moreover, at the close of the guilt phase, the trial court properly instructed the jury, including instructing it that neither the trial court's rulings, instructions, nor any other remarks were meant to indicate any opinion as to the facts of the case or as to what its verdict should be. The trial court also instructed the jury that it was the sole and exclusive judge of the credibility of the witnesses and the weight to be given their testimony. Accordingly, although the trial court's pretrial comments were improper, when we consider the jury instructions and that the evidence was more than sufficient to support a conviction, we conclude the error is harmless beyond a reasonable doubt.

Based upon the foregoing and the record as a whole, we conclude that the evidence was sufficient to support the defendant's conviction for first degree murder. Further, the error in the pre-testimony instructions to the jury was harmless beyond a reasonable doubt. The judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, JUDGE